IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TULIO RIVAS, | ) | CASE NO. 8:11CV3087 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| IOWA PLAINS SIGNING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 19) filed by Defendant Iowa Plains Signing, Inc. ("IPS"). The Court has considered the parties' briefs (Filing Nos. 20, 23, 24) and evidence (Filing Nos. 21, 22) submitted in support of their respective positions. For the reasons discussed below, the Motion will be granted.

## FACTUAL BACKGROUND

Unless noted otherwise, the following facts are those that are stated in the briefs and supported by pinpoint citations to evidence in the record, that the parties have admitted, or that the parties have not properly resisted as required by NECivR 56.1 and Federal Rule of Civil Procedure 56.

On October 22, 2007, IPS acquired Highway Barricades by purchasing only its assets. Following the acquisition, IPS began doing business in Omaha, Nebraska, as "Highway Signing Inc." IPS did not acquire any of the employees of Highway Barricades in the acquisition, and required them to submit new applications for employment following the acquisition. Plaintiff Tulio Rivas, who is Hispanic, worked for Highway Barricades before IPS acquired it. Rivas applied for a position with IPS shortly after the acquisition, and was hired as a traffic control laborer. As a traffic control laborer, Rivas did a lot of

driving and would set up lane closures and road-work signs.  Rivas's employment with IPS was at-will.

After he was hired, Rivas received an IPS Harassment Policy Statement (the "Policy").  The Policy stated that "[IPS] is committed to a workplace free of discrimination and harassment based on race, color, religion, age, sex, national origin, disability, status as a veteran, or any other protected status."  (Filing No. 21-2, at CM/ECF p. 2.)  In a section titled "**HARASSMENT**" the Policy stated, "[o]ffensive conduct or harassment of a sexual nature, or based on race, color, religion, age, sex, national origin, disability, status as a veteran or any other status is prohibited."  (*Id.* at CM/ECF p. 2 (emphasis in original).)  In a section titled "**REPORTING HARASSMENT**," the Policy stated:

> [c]omplaints of harassment of any type should be reported immediately so that an investigation and corrective action can be taken, if appropriate. . . .
>
> An investigation will be promptly undertaken and appropriate disciplinary actions and corrective measures will be instituted if the employee's allegations warrant such action.  Persons who commit acts of intimidation or other harassing behavior of any type, will be warned to discontinue such conduct and will be disciplined according to the severity of the case.  Discipline may include actions up to and including termination of employment.

(*Id.* at CM/ECF p. 3 (emphasis in original).)  Rivas signed the Policy.

Rivas also received an IPS Employee Handbook (the "Handbook").  The Handbook reiterated the Policy.  (*Id.* at CM/ECF p. 12-14.)  It also stated:

> The management of [IPS] has established policies and procedures, which are to be followed by all employees.  These policies and procedures are intended to benefit and protect the company and its employees.
>
> Corrective Action may become necessary when a supervisor/manager notices signs of an employee's poor performance, excessive absenteeism,

> failure to observe company policies and procedures, unsafe work habits or other issues which do not meet the company's expectations.
>
> If performance and/or behavior problems occur, formal corrective action will be taken.  This may include a verbal warning, a written warning, a final written warning, suspension without pay and/or termination of employment.  Please note that "progressive action" is not required.  The company retains the right to skip one or more of these steps.

(*Id.* at CM/ECF p. 14.)  The Handbook stated that IPS "reserve[d] the right to exercise judgment in determining behavior that might be subject to discipline."  (*Id.* at CM/ECF p. 15.)  The Handbook also specified that IPS vehicles were "to be used for [IPS] business only," and that "[a]ny abuse of th[e] policy w[ould] lead to disciplinary actions and/or discharge."  (*Id.* at CM/ECF p. 9.)

Rivas signed an acknowledgment indicating that he "agree[d] to abide by all rules and regulations set forth" in the Handbook, and that he "underst[ood] that not doing so could result in disciplinary action including, but not limited to, suspension and/or termination of [his] employment."  (*Id.* at CM/ECF p. 1.)  Rivas understood his job required him to comply with the Handbook and IPS's policies, and that he could be terminated for violating IPS's policies.

While working for IPS, Rivas received a verbal warning from Matt Fatka, his supervisor, for whistling at women and talking to other people while on the job.  On October 10, 2008, Fatka suspended Rivas for a week and issued a Corrective Action Form (*Id.* at CM/ECF p. 16) because Rivas drank beer during his lunch break.  The Corrective Action Form indicated that it was Rivas's first and final warning, and that the consequence of a further infraction would be termination.  (*Id.*)  On April 9, 2009, Rivas received a warning

3

that indicated he was "in a **Poor/Probation** <u>category</u> as a driver of [IPS] vehicles." (*Id.* at CM/ECF p. 18 (emphasis in original).)

On June 24, 2009, Rivas received a ticket for stalking and disturbing the peace. (*Id.* at CM/ECF p. 17; Filing No. 21-3, at CM/ECF p. 7, 34:15-24.) He received the ticket because he had been using a vehicle to shine a light on women who were walking down the street. When receiving the ticket, Rivas informed the police officer that he worked for All Road Barricades, one of IPS's competitors. Shortly thereafter, a representative from All Road Barricades called Fatka to complain that Rivas had represented himself to be an employee of All Road Barricades. Fatka told Rivas that he could be terminated if he was found to be harassing women again.

On or about October 28, 2009, Rivas submitted to Fatka a signed, written report in which Rivas indicated that he heard from a co-worker, Jeff Costello, that two of Rivas's other co-workers, Pat and John Vodicka, had been using racist terms when talking about Rivas. Rivas stated in the report:

> I was working on 75 Hwy Project, on Wednesday 14th, and my coworker Jeff Costello, came to me and he told me I am listen [sic] every day to Pat and John, talking about you and Greg using racist words like, wetbacks, spics, beners [sic], etc. and he also told me I am not the only one. You can also ask to Justin [sic]. He is with me when these guys talk about you [sic]. And I asked to Justin [sic] and he told me the same thing they also told me those guys was talking [sic] yesterday . . . when I came in at 8:00 a.m.

(Filing No. 21-2, at CM/ECF p. 19.) Rivas testified in his deposition that he had been working with the Vodickas "most of the time" (Filing No. 21-3, at CM/ECF p. 13, 60:11-14), but also that "most of the time" Rivas and the Vodickas were "kind of separate. They [worked] during the day" while Rivas worked "during the nighttime at a different location," (*Id.* at CM/ECF p. 14, 62:25-63:4), and that he worked with the Vodickas, on average, for

4

"[m]aybe [a] couple times a week for . . . [a] few hours." (*Id.* at CM/ECF p. 15, 66:6-13.) Although the report indicated that Rivas heard about the Vodickas' racist comments through another co-worker, Rivas testified in his deposition that the Vodickas had been making racist comments directly to "his face" for a few months prior to the time Rivas submitted his report to Fatka.  (*Id.* at CM/ECF p. 13-14, 60:13-66:5.)

After receiving Rivas's report of harassment, Fatka conducted an investigation and interviewed Gregorio Martinez, Justin Draculich, and Jeff Costello, the three employees Rivas claimed were aware of the alleged harassment.   On October 30, 2009, Fatka obtained those three employees' written statements.  On November 2, 2009, Fatka met with Pat and John Vodicka to discuss Rivas's report.  During their meeting, Pat and John denied the allegations of harassment against them.   Pat mentioned, however, that, at times, jokes based on nationality had been made.  Fatka directed the Vodickas not to use racial slurs in reference to others or in jokes and to encourage others to do the same. Fatka also warned the Vodickas that their employment would be terminated if Fatka received another similar complaint about them.  Fatka documented the meeting in writing and placed a copy of the documentation in both of the Vodickas' personnel files.  (Filing No. 21-4, at CM/ECF p. 11.)

After Fatka met with the Vodickas, Pat Vodicka, in front of Rivas's co-workers, referred loudly to Rivas as a "beaner" or "pig," or "something like that."  (Filing No. 21-3, at CM/ECF p. 15, 67:1-13.)  A few days later, Pat confronted Rivas and, while laughing, said he was sorry for being "so racist."  (*Id.* at 67:14-21.)   John spat on the ground in front of Rivas on two or three occasions after Rivas filed his report.  (*Id.* at CM/ECF p. 21, 109:1-16.)  Thereafter, the Vodickas did not make any further racial comments to Rivas's face,

although Rivas heard from a co-worker that the Vodickas continued to make racial comments behind Rivas's back. (*Id.* at CM/ECF p. 15-17, 67:14-68:7, 70:22-72:9, 73:14-16.) Rivas was no longer assigned to the same projects as the Vodickas. (*Id.* at CM/ECF p. 16, 70:22-25, 72:9.) The October 28, 2009, report was the only report Rivas submitted to Fatka alleging harassment.

On December 4, 2009, Rivas filed with the Nebraska Equal Opportunity Commission ("NEOC") a charge of discrimination against IPS. (Filing No. 21-2, at CM/ECF p. 21.) Although Rivas signed the charge of discrimination, some of the allegations related to harassment directed only at Gregorio Martinez, one of Rivas's co-workers; those allegations did not relate to harassment directed at Rivas. (Filing No. 21-3, CM/ECF p. 17-18, 76:24-79:11.) The allegation that Fatka gave harder assignments after receiving the written report related only to Gregorio; Rivas's job and his compensation were the same before and after submission of the written report. (*Id.* 21-3, at CM/ECF p. 18, 77:20-79:11.)

On December 23, 2009, Rivas called and informed Fatka that the IPS truck Rivas had been driving broke down at a gas station. Fatka provided Rivas with the phone number of a towing company, told Rivas to have the truck towed back to IPS's shop, and asked Rivas to call him back if Rivas encountered any problems. The next morning, Fatka received a phone call from another IPS employee and learned that Rivas's truck was not in IPS's shop or where Rivas had said the truck broke down, but was instead in a grocery store parking lot a few miles away from where the truck broke down. Rivas had called a co-worker who showed up with another company truck. (*Id.* at CM/ECF p. 10, 45:22-46:7.)

6

Rivas and his co-worker had decided to tow the truck to a place they believed was safer. (*Id.* at 46:2-11.)[1]

On January 4, 2010, Fatka received a complaint from another employee that Rivas had brought his child to work and that the child rode with Rivas in his IPS truck.  At around the same time, Fatka learned Rivas had been taking his laptop to work, parking in hotel parking lots, and using the hotel's WIFI to connect to the internet.[2]  Fatka also learned that an IPS employee had been receiving text messages and calls on his company telephone from a woman who was trying to tell Rivas to leave her alone and accusing Rivas of making unwanted sexual advances.  Fatka asked the employee for the woman's name and phone number so that he could call her.  When he did, the woman told Fatka that Rivas had been sexually harassing her through phone calls and text messages.  She also indicated that Rivas would not stop calling her and sending her text messages and pictures, even though she had told him to stop.  Fatka asked the woman when she was receiving phone calls and text messages from Rivas.  The woman indicated that she received phone calls and text messages from Rivas at times that matched the hours of Rivas's work shifts.

Fatka also learned that Rivas had left his work site early, and without permission. (Filing No. 21-4, at CM/ECF p. 3, ¶ 16; Filing No. 21-3, at CM/ECF p. 12-13, 56:24-57:4.) When asked why he left early, Rivas said he left because it was cold.  (Filing No. 21-4, at

---

[1]Although IPS admits for purposes of the present Motion that Rivas decided to tow the broken-down truck to a place he believed to be safer than where it had been, IPS contends that Rivas did not provide Fatka with an explanation for why the broken-down truck was not where Rivas had originally reported it to be or why Rivas did not follow Fatka's direction to have the truck towed to IPS's shop.  (Filing No. 21-4, at CM/ECF p. 3, ¶ 15.)

[2]Rivas does not deny that he had been taking his laptop to work, parking in hotel parking lots, and using the hotel's WIFI to connect to the internet.  However, he contends that he never received a warning for taking his laptop to work, and that other IPS workers had brought their laptops to work and never received a warning for doing so.  (Filing No. 21-3, at CM/ECF p. 13, 57:12-24.)

CM/ECF p. 14; Filing No. 21-3, at CM/ECF p. 12-13, 56:24-57:4.)  Rivas does not deny that he left early, but contends that he did not leave before his replacement arrived, and that he often stayed later than his scheduled shift because his replacement would fail to show up on time.  (Filing No. 21-3, at CM/ECF p. 13, 57:6-11.)

On January 5, 2010, Fatka terminated Rivas's employment with IPS.  Rivas believed Fatka regretted firing Rivas.  Fatka told Rivas that Rivas was his "best worker, . . . [his] best man," but that he "had to let [Rivas] go."  (*Id.* at 59:8-18.)  Fatka said that Rivas's employment was being terminated due to insubordination (failing to have the truck towed as Fatka had instructed), having a child in an IPS truck during work, leaving his shift early and abusing work time, and harassing women while at work.  When Fatka met with Rivas, Rivas admitted that he had been contacting and texting the woman during work hours.

Sometime after January 25, 2010, Rivas filed another charge against IPS with the NEOC claiming that his termination was retaliatory.  The NEOC found in favor of IPS on Rivas's claim for discrimination and his claim for retaliation.  On or about May 10, 2011, Rivas filed this action in the District Court of Lancaster County, Nebraska, alleging that, in violation of Title VII of the Civil Rights Act of 1964, IPS subjected him to unwanted harassment, and retaliated against him for filing a charge of discrimination with the NEOC. (Filing No. 1-1.)  IPS removed the action to this Court on June 10, 2011.  (Filing No. 1.)  On April 6, 2012, IPS filed the present Motion, seeking summary judgment on Rivas's claims of racial harassment and retaliation.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact

8

and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.,* 655 F.3d 811, 819 (8th Cir. 2011). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)), *cert. denied,* 130 S. Ct. 1074 (2010). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita,* 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary

judgment.  *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

"[A] plaintiff may not merely point to unsupported self-serving allegations," *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (quotations omitted), or to "'self-serving affidavits,'" *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) (internal quotations omitted) (quoting *Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008)), to substantiate his or her allegations.  Further, "[i]n ruling on a motion for summary judgment, the district court is not obligated to wade through and search the entire record for some specific facts which might support" a party's claim.  *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (quotations omitted).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I. Harassment (Hostile Work Environment) Claim

Title VII makes it "unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Tademe v. Saint Cloud State Univ.*, 328 F.3d

10

982, 990-91 (8th Cir. 2003) (quoting 42 U.S.C. § 2000e-2(a)(1)).  In other words, Title VII bars the "[h]arassment of an employee based on a prohibited factor (e.g., gender, race, religion)."  *Id.* at 991 (citing *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000)).

To establish a harassment-based, hostile work environment claim, the employee "must show that: (1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment."  *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005) (citing *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003)).  When the employee alleges that a non-supervisor harassed him or her, then the employee must also show that the "employer knew or should have known of the harassment and failed to take prompt and effective remedial action."  *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) (citing *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 531 (8th Cir. 2008)); *see also Palesch*, 233 F.3d at 566 & n.5 (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999)).[3]

IPS does not contend that Rivas cannot establish the first three elements of his claim.  Rather, IPS argues that Rivas has failed to point to evidence sufficient to establish that (1) the alleged harassment "affected a term, condition, or privilege" of Rivas's

---

[3]Courts have applied the same standards for harassment-based, hostile work environment claims regardless of whether they are brought under Title VII or 42 U.S.C. § 1981, *see e.g. Ellis v. Houston*, No. 8:10CV3222, 2012 WL 1440260, *69 (D. Neb. Apr. 26, 2012) (citing *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 941 (8th Cir.2010)), and regardless of whether they are based on racial harassment or sexual harassment.  *See e.g. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-87 & n. 1 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986)).

11

employment, and/or (2) IPS knew or should have known of the harassment and failed to take prompt, effective remedial action.

"Harassment which is severe or pervasive is 'deemed to affect a term, condition, or privilege of employment.'" *Watson*, 619 F.3d at 942 (quoting *Singletary*, 423 F.3d at 892). This "harassment standard[ ] [is] demanding." *Al-Zubaidy v. TEK Indus.*, Inc., 406 F.3d 1030, 1038 (8th Cir. 2005) (citing *McCurdy v. Ark. State Police*, 375 F.3d 762, 768 (8th Cir. 2004)).   Courts are directed "to apply the demanding harassment standards to 'filter out complaints attacking the ordinary tribulations of the workplace.'" *Id.* at 1039 (internal quotations omitted) (quoting *Faragher*, 524 U.S. at 788).

The Court may consider several factors to determine whether harassment has affected a term, condition, or privilege of employment.   Those factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 863 (8th Cir. 2010) (quoting *Al-Zubaidy*, 406 F.3d at 1038); *see also Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011).   "[C]ourt[s] may also consider the 'physical proximity to the harasser, and the presence or absence of other people,'" *Ellis*, 2012 WL 1440260, at *69 (quoting *Watson*, 619 F.3d at 943), and evidence of "racial animus . . . directed at co-workers in the same protected group" if "the plaintiff[ ] [is] aware of th[e] conduct." *Watson*, 619 F.3d at 943 (citing *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802–03 (8th Cir. 2009)).   The harassment must be "severe 'as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the

12

victim.'"  *Singletary*, 423 F.3d at 892 (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)).

"Sporadic or casual comments are unlikely to support a hostile environment claim." *Carter*, 173 F.3d at 702 (citing *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 474 (8th Cir. 1995); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)).  "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)'" are also insufficient, and the "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment.'"  *Watson*, 619 F.3d at 942 (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 2100 (2007)).  The "'conduct must be extreme and not merely rude or unpleasant.'"  *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). In other words, "'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Singletary*, 423 F.3d at 892 (quoting *Tademe*, 328 F.3d at 991).

To "'determin[e] whether the employer failed to take prompt and effective remedial action to end the harassment,'" courts consider "'the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment.'"  *Jenkins*, 540 F.3d at 749 (alterations in original) (internal quotation marks omitted) (quoting *Arraleh*, 461 F.3d at 979).

13

Viewing the facts in the light most favorable to Rivas, no reasonable finder of fact could find in favor of Rivas on his racial harassment, hostile work environment claim. Although the alleged harassment that took place prior to the time Rivas submitted his report to Fatka may have altered the terms, conditions, or privileges of Rivas's employment,[4] the record reveals that IPS took prompt and effective remedial action to end the harassment. Within four days of receiving Rivas's report, Fatka conducted an investigation and interviewed the three individuals who were reported as being aware of the alleged harassment. Within two days of conducting his investigation and interviewing those three individuals, Fatka met with the Vodickas to discuss Rivas's report. In that meeting, although the Vodickas denied the allegations of harassment, Fatka made clear to the Vodickas that harassment was inappropriate, encouraged them to prevent others from engaging in that type of conduct, and threatened to fire them if they were the subject of another complaint of harassment.

The record reveals that, shortly after the meeting, Pat Vodicka laughed at Rivas when apologizing to Rivas, and that John spat on the ground in front of Rivas on two or three occasions.[5] However, the record also reveals that shortly thereafter, IPS separated the Vodickas and Rivas so that they no longer worked on any of the same work projects.

---

[4] See Fuller, 618 F.3d at 864 (citing Moring v. Ark. Dep't of Corr., 243 F.3d 452, 456 (8th Cir. 2001) ("Whether conduct rises to the level of harassment is usually a factual determination for the jury.").

[5] See Carter, 173 F.3d at 701 (citing White v. Honeywell, Inc., 141 F.3d 1270, 1273, 1276 (8th Cir.1998); Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 356 (8th Cir. 1997); Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861-62 & n. 8 (5th Cir.1993); Gipson v. KAS Snacktime Co., No. 98-1212, 1999 WL 153038, at *5 (8th Cir. Mar. 12, 1999)) ("racial epithets are often the basis of racial harassment claims and may likewise create an inference that racial animus motivated other conduct as well."); see also Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1253 (M.D. Ala. 2001) (citing Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990) ("A remedial measure that makes the victim of sexual harassment worse off, however, is ineffective per se.").

14

As Rivas admitted, he was then able to avoid the Vodickas and was not subjected to any further direct racial harassment, and he did not submit another report of harassment to Fatka. To the extent that the Vodickas may have made more racial comments behind Rivas's back, those comments would not have permeated Rivas's workplace "'with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Rivas]'s employment and create an abusive working environment.'" *See Singletary*, 423 F.3d at 892 (quoting *Tademe*, 328 F.3d at 991); *see also Watson*, 619 F.3d at 943 (citing *Delph v. Dr. Pepper Bottling Co. of Paragould*, 130 F.3d 349, 356 (8th Cir. 1997)). Therefore, IPS's Motion will be granted as it relates to Rivas's racial harassment, hostile work environment claim.

## II. Retaliation Claim

"Title VII prohibits employers from retaliating against employees who file charges of discrimination." *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). The burden-shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "'governs the order and allocation of proof for retaliation claims'" under Title VII. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (quoting *Kratzer v. Rockwell Collins., Inc.*, 398 F.3d 1040, 1048 (8th Cir. 2005)).

"Under this analysis, a plaintiff must first establish a prima facie case of retaliation." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). The plaintiff "establish[es] a prima facie case by showing that he or she: '(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.'" *Logan*, 416 F.3d at 880 (alteration in original) (quoting *Kohler*, 335 F.3d at 772). "'[T]he threshold

of proof necessary to establish a prima facie case is minimal.'" *Id.* at 881 (quoting *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998)). The "defendant must then rebut the plaintiff's prima facie case by presenting evidence of a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Kohler*, 335 F.3d at 772-73 (citing *Coffman v. Tracker Marine, LP*, 141 F.3d 1241, 1245 (8th Cir. 1998)).

"If the defendant satisfies its burden, the plaintiff is 'then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.'" *Logan*, 416 F.3d at 880 (alterations in original) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)). "'[A]n employee's attempt to prove pretext . . . requires more substantial evidence [than it takes to make a prima facie case], . . . because unlike evidence establishing the prima facie case, evidence of pretext . . . [and retaliation] is viewed in light of the employer's justification.'" *Id.* at 881 (second and third alterations in original) (internal quotation marks omitted) (quoting *Allen Health Sys.*, 302 F.3d at 834).

IPS contends that Rivas cannot establish the third element of his prima facie case. IPS also asserts that, even if Rivas could establish a causal connection between Rivas engaging in a protected activity and the termination of his employment, IPS had legitimate, nondiscriminatory reasons for terminating Rivas's employment, and Rivas has failed to point to evidence indicating that those reasons were pretextual. Rivas asserts that he has pointed to evidence sufficient to establish a causal link between his protected activity and the termination of his employment, and that he has pointed to evidence that indicates IPS's reasons for terminating his employment were pretextual.

16

"[E]vidence that gives rise to 'an inference of retaliatory motive' on the part of the employer . . . is not only sufficient to prove the required causal link but is also necessary." *Kipp v. Mo. Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002) (citing *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992); *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989)).   Ordinarily, "'more than a temporal connection'" between the protected activity and the adverse employment action is required to establish a prima facie case.   *Kipp*, 280 F.3d at 897 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)).   "'A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive.'"   *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)); *see also Kohler*, 335 F.3d at 774 ("The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes."); *Kipp*, 280 F.3d at 897 ("Here, the interval of two months between the complaint and [the employee]'s termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [the employee]'s favor on the matter of causal link.").   Furthermore, the presence of "other intervening events between protected activity and adverse action may 'erode' any causal connection suggested by temporal proximity between protected activity and adverse action."   *Staples v. Delavan Inc.*, No. C 07-3019-MWB, 2008 WL 5215130, *25 (N.D. Iowa Dec. 11, 2008) (citing *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005)).

The Eighth Circuit has found that an "interval of two months between the complaint and [the employee]'s termination so dilutes any inference of causation" that it was

17

"constrained to hold as a matter of law that the temporal connection could not justify a finding in [the employee]'s favor on the matter of causal link."  *Kipp*, 280 F.3d at 897.  The Eighth Circuit has also found "four-week interval between [an employee]'s complaint and her layoff" to be insufficient evidence "to establish a showing of causal connection" where there were intervening circumstances that gave the employer reason to terminate the employee's employment.  *Cheshewalla*, 415 F.3d at 852; *see also Nelson v. J.C. Penny Co., Inc.*, 75 F.3d 343, 346-47 (8th Cir. 1996) (finding no causal connection between protected activity and adverse employment action where evidence of causal connection consisted only of the fact that employee was fired one month after engaging in a protect protected activity).  Even a one-week interval in between the protected activity and the adverse employment action may be insufficient to establish a causal connection where timing of the adverse employment action is the only evidence of the causal connection. *See Holecek v. City of Hiawatha*, No. 09-CV-113-LRR, 2010 WL 3927801, *10 (N.D. Iowa Oct. 4, 2010) (finding a one-week interval insufficient where the employee only pointed to the timing of the termination to support her retaliation claim).

The parties do not dispute that Rivas engaged in a protected activity on October 28, 2009, when he submitted a written report of harassment to Fatka, and on December 4, 2009, when he filed a charge of discrimination with the NEOC.  The parties also do not dispute that Rivas's employment was terminated on January 5, 2010.

Only one month elapsed in between the time Rivas filed a charge of discrimination with the NEOC and the time IPS terminated his employment.  During that month, however, the record reveals that Rivas failed to comply with his supervisor's instructions to have his truck towed to IPS's shop; Rivas brought his child to work, and let his child ride in his

18

company truck, in violation of IPS's vehicle policy; and, after Rivas had been warned that his employment would be subject to termination if he was found to be harassing another woman, a woman complained that, during his work shifts, Rivas was harassing her through phone calls and text messages. The record also reveals that during that one-month period, Rivas had left work early and without permission on at least one occasion and that, during his work shift, Rivas would park his truck in a hotel parking lot so that he could access the hotel's wireless internet on his laptop. The Handbook Rivas signed stated that IPS "reserve[d] the right to exercise judgment in determining behavior that might be subject to discipline." (Filing No. 21-2, at CM/ECF p. 15.) Rivas admits that, after he filed the charge of discrimination with the NEOC, he was not given harder assignments and that his pay remained the same. Rivas has not pointed to any evidence indicating that other employees who engaged in the same sort of conduct Rivas engaged in, but who had not engaged in a protected activity, were not fired. Under the circumstances of this case, the intervening events "'eroded' any causal connection suggested by temporal proximity between" Rivas filing the charge of discrimination with the NEOC and the termination of Rivas's employment. *See Staples*, 2008 WL 5215130, at *25 (citing *Cheshewalla*, 415 F.3d at 852).

More than two months elapsed in between the time Rivas submitted the written report to Fatka and the time Rivas's employment with IPS was terminated. No reasonable finder of fact could conclude that there was a causal connection between Rivas submitting the report to Fatka and Rivas's termination. *See Kipp*, 280 F.3d at 897 ("Here, the interval of two months between the complaint and [the employee]'s termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal

connection could not justify a finding in [the employee]'s favor on the matter of causal link.").  Therefore, Rivas has failed to establish his prima facie case of retaliation, and IPS's Motion will be granted as it relates to Rivas's claim of retaliation.

Accordingly,

IT IS ORDERED:

1.      The Motion for Summary Judgment (Filing No. 19) filed by Defendant Iowa Plains Signing, Inc. is granted;

2.      This action is dismissed, with prejudice; and

3.      A separate Judgment will be entered.

DATED this 30th day of May, 2012.

BY THE COURT:

S/Laurie Smith Camp
Chief United States District Judge